In re ACE FINANCE
COMPANY, Debtor.

ACE FINANCE COMPANY, Plaintiff.

v.

Carol Frances BERG, Barbara Bonner, Diana Loke, M.S. Sales Corp., et al., Frank Kleinman, Janet Kleinman, Mildred K. Schad, Edith Sozio, Jeff Sozio, et al., Elyse Turner, et al., and Edward H. Chesler, et al., Defendants.

Bankruptcy No. B83–2897.

Adv. Nos. B85–406, B85–408, B85–417, B85–418, B85–413, B85–414, B85–424, B85–428, B85–429, B85–433 and B85–435.

United States Bankruptcy Court,
N.D. Ohio, E.D.

Aug. 22, 1986.

See also, Bkrtcy., 59 B.R. 667.

Dianne Blocker, Harlan Stone Hertz, Cleveland, Ohio, for plaintiff.

Thomas M. McCarty, Akron, Ohio, Harry Greenfield, Cleveland, Ohio, Mary Whitmer, Akron, Ohio, Mildred K. Schad, Parma, Ohio, Richard D. Tomsick, Cleveland, Ohio, for defendants.

## MEMORANDUM OF OPINION AND ORDER

RANDOLPH BAXTER, Bankruptcy Judge.

These several actions were consolidated and came on for a bifurcated trial proceeding solely on the issue to determine whether the Debtor, Ace Finance Company (Ace) was insolvent at the times certain alleged preferential transfers were made preceding the filing of its petition under Chapter 11. The Plaintiff in each of these matters is the duly appointed Creditors Committee.

The facts pertinent to the Court's determination of the insolvency issue are as follows and constitute the findings of this Court pursuant to Rule 52, Fed.R.Civ.P., and Bankruptcy Rule 7052:

On October 20, 1983, Ace caused to be filed its petition for reorganization under Chapter 11. Consequent with that filing, Ace filed its schedules of assets and liabilities. Those schedules, as filed, indicated that Ace was in a solvent status on October 20, 1983, with assets totalling $12,238,-513.50, against liabilities of $11,837,599.88. Subsequently, on June 27, 1984 and again on October 18, 1984, Ace amended its scheduled liabilities. The June 27, 1984 amendment added two more liabilities which were parenthetically described as "disputed, contingent and unliquidated," in respective amounts of $255,000.00 and $1,378,000.00. Combined, these additional liabilities effectively increased Ace's total indebtedness to $13,470,599.88, an amount in excess of its assets. The October 18, 1984 amendment to Ace's scheduled liabilities added another indebtedness in the amount of $118,000.00. Incorrectly, this second amendment by Ace to its scheduled liabilities showed a new total of $11,955,-599.00. That figure is an incorrect one. Upon the Court's correction of this mathematical error, the total liabilities of Ace reflects amount of $13,588,599.88. Again, the schedules indicate debts in excess of assets.

*Applicable Law:*

The applicable law reviewed to determine whether the debtor was insolvent at the time of the alleged preferential transfers is as follows:

§ 101(29) Insolvency. [I]nsolvent means—(A) with reference to an entity other than a partnership, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—.

(i) property transferred, concealed or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522....

1. At the time of these alleged preferential transfers, 11 U.S.C. 101(26) was in effect, with the

11 U.S.C. 101(26)(A) (1982) (Currently codified at 11 U.S.C. 101(29)(A) (Supp. II 1984).[1]

§ 547. Preferences [Generally] and, particularly; (b) Except as provided in subsection (c) ... the trustee may avoid any transfer of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for an account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made (A) on or within 90 days before the date of the filing of the petition; or (B) between 90 days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;

(5) that enables such creditor to receive more than such creditor would receive ...

(f) For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition. 11 U.S.C. 547(f).

(g) For the purposes of this section, the trustee has the burden of proving the avoidability of a transfer under subsection (b) ... and the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the non-avoidability of a transfer under subsection (c) of this section. 11 U.S.C. 547(g).

Rule 1009. Amendments of Voluntary Petitions, Lists, Schedules, and Statements of Financial Affairs:

A voluntary petition, list [or] schedule ... may be amended by the debtor ... at any time before the case is closed....

*Analysis:*

The sole issue to be determined by the Court in this bifurcated proceeding is whether the debtor, Ace, was insolvent at

same wording as is presently contained in 101(29).

the time of the alleged preferential transfers. In reaching this determination, the Plaintiff, Creditors Committee, contends that if it successfully proves Ace to be insolvent on June 30, 1982, on December 31, 1982 and on December 31, 1983, and further, if Plaintiff proves there was no material beneficial change in Ace's financial condition from June 30, 1982 through December 31, 1983, then, subject to a persuasive preponderance of contradictory evidence, this Court should find that Ace was insolvent at all pertinent times.

On the other hand, the several defendant creditors contend that the Plaintiff, in addition to providing evidence of insolvency as of a date within a reasonably short period of time of the transfer date, must prove that there was no change in Ace's financial condition during the subject interval.

In furtherance of these contentions, the parties hereto have entered into the following stipulations:

1. The Debtor filed its voluntary petition in bankruptcy on October 20, 1983;

2. The 90–day period prior to the filing of the petition in bankruptcy commences on July 23, 1983;

3. The Debtor filed its schedules of assets and liabilities, and twice amended its schedules of liabilities;

4. This Court has jurisdiction over the subject matter and over the Defendants of and in these adversary cases, and proper service has been obtained over each defendant.

An examination of the Plaintiff's Exhibit A, "Consolidated Financial Statements of Ace as of December 31, 1982 and June 30, 1982 and 1981, together with Auditor's Report," was beneficial. Therein, Arthur Anderson & Company (A/A) took particular note of Ace's intended disposition of certain real estate development purchase options. A/A indicated that the lapsed purchase option, according to generally accepted accounting standards, should have been expensed as capitalized costs. This was not done by Ace. (*Id.* at p. 2). Additionally, Ace incurred a net loss of $892,338.00 for the year ending June 30, 1982. Resultingly, Ace's liabilities exceeded its assets by $132,727.00 and $271,839.00, respectively at December 31, 1982 and June 30, 1982. (*Id.* at p. 3). This was a substantial operating loss which occurred in the year ended June 30, 1982, resulting in a retained deficit that continued through December 31, 1982. (*Id.* at p. 1 of Notes). At December 31, 1982, the accompanying balance sheet to Ace's consolidated financial statements reflected a working capital deficiency of $1,288,-242.00 for B.S.I., an Ace affiliate. (*Id.*, p. 7 of Notes).

Plaintiff's Exhibit B, "Ace Finance Company and Subsidiaries, September 30, 1983," was admitted into evidence. This exhibit constituted a trial balance of Ace and its subsidiaries: Beachwood Mortgage, Beachwood Development, and Highland Meadows. The combined totals of assets and liabilities reflected an operating loss of $297,524.00.

Plaintiff's Exhibit C, "Combined Financial Statements Together With Accountant's Review Report as of December 31, 1983," was also examined. At the outset, A/A indicated all information included in these combined financial statements were representations of the management of Ace and its subsidiaries. Therein, it is noted that B.S.I. incurred a net loss of $4,154,-543.00. That amount included $1,865,-042.00 which was written off as purchase price in excess of tangible assets acquired (i.e., good will), and a provision for lease terminations in an amount of $450,000.00 for the year ended December 31, 1983. Of significance, the accountant (Arthur Anderson & Company) indicated, "These factors, among others, indicate that Ace and B.S.I. may be unable to continue in existence." [2]

The testimony of the Plaintiff's expert business consultant, Earl Eisenberg revealed, in part, the following:

Mr. Eisenberg's firm, Eisenberg, and Associates, Inc., developed management and

---

2. *Id.,* at p. 2, dated April 27, 1984.

financial strategies for business and industry for approximately eight years. In the course of his normal business routine he placed fair value on assets, in addition to examining property values and debts. Respecting his participation in these proceedings, he testified that this was the first time that he had valued assets in the manner undertaken for these proceedings, however, his testimony revealed that he had valued assets for a number of companies.[3] Upon clarification, he testified that his previous asset valuations in most instances were performed as a general overall valuation of a particular business concern, rather than through an asset-by-asset basis. (Tr. 6, L. 8); however, in some instances, he had conducted asset-by-asset valuations. (Tr. 6, L. 22).

Among other testimony, it was conceded that he was not an appraiser of real estate (Tr. 11, L. 19), and further possessed no certification as an appraiser in either real or personal property. Further, Mr. Eisenberg had no prior involvement in a bankruptcy proceeding regarding a negotiated sale. (Tr. 16, L. 15). He purposely, was retained by the Plaintiff, Creditors Committee, as an experienced business consultant to establish fair valuations on Ace's assets and liabilities. In the instant proceedings, he reviewed Exhibits A, C, E, F and G to establish his fair valuations, in addition to certain trial balances (Tr. 17–18) which he felt were beneficial.

Regarding the aforementioned exhibits, he personally did not review them but rather, at his direction, had an accountant (Mr. Steve Friedman) provide him with requested information. (Tr. 20–21). During this process, he "supervised him on a constant basis." Specifically, Mr. Friedman provided him with a listing of the consolidated and separate companies involved with Ace in order for him to discern the properties, debts and operating income statements.

When establishing his valuations regarding Ace's assets and liabilities, Mr. Eisenberg utilized the various categories and book values listed by Mr. Friedman. (Tr. 23).

Although his testimony revealed he did not prepare financial statements and was therefore without specific knowledge of accounting procedures used by accountants in each asset valuation, he was knowledgeable regarding the methodology used by Arthur Anderson in listing Ace's finance receivables (Tr. 26), wherein the finance receivable was listed at the amount of the receivable plus interest. He was not aware that any of Ace's liabilities were disputed or contingent. On the other hand, the Defendants introduced no evidence to the contrary.

When assessing fair value, his definition of that term was inclusive of the price that a reasonable business buyer would pay for an asset on a going concern basis. (Tr. 35). Applying that definition, he valued the Euclid Truck loans at zero and so expressed his opinion. (Tr. 36). Similarly, Beachwood Spas (B.S.I.) (Fun and Fitness) was valued at zero. Fun and Fitness was so valued because it was in a Chapter 11 proceeding with a questionable ability to continue operations. Subsequently, it (Fun and Fitness) was to become Beachwood Spas. A lengthy explanation was given by Mr. Eisenberg as justification for his zero-valuing of B.S.I. This explanation included a B.S.I. loss period between October and December 1982 in excess of $100,000.00. Also, on December 31, the delinquency rate of B.S.I. approximated 32 percent on all collection accounts due. Further, on December 31, 1982, B.S.I. listed its assets on its financial statement and on Ace's financial statement of $2,361,000.00. Of that figure, $1,865,042.00 was listed as purchase price in excess of tangible assets acquired, leaving actual tangible assets in the amount of $495,966.00. Essentially, this

---

**3.** Mr. Eisenberg initially became familiar with Ace's bankruptcy proceeding some two years ago when this Court appointed him, upon request of a party-in-interest, to serve as a "watch dog" over Ace's operations. In May of 1986, he again was retained by counsel for the Creditors Committee to examine Ace's financial affairs for three periods coinciding with Ace's subject financial statements.

meant that B.S.I.'s assets were principally "good will" as opposed to tangible assets. Those actual tangible assets faced total liabilities of $2,465,998.00. (Tr. 39–40; See Ex. H). Additionally, Ace's financial statements indicated loans made by it to B.S.I., along with investments it made in B.S.I. on three separate occasions in respective amounts of $408,602.00, $803,200.00 and $1,630,300.00. On December 31, 1983, B.S.I. incurred an operating loss for the year ending 1983 of approximately $1,800,-000.00. Totally, these several factors justified Eisenberg's zero-valuation of B.S.I. as a nonoperating concern (Tr. 47).

Page 1 of Exhibit J reflected a provision for possible losses. Between December 31, 1982 and December 31, 1983, the provision for possible losses increased from $4,122.00 to $1,027,236.00. Mr. Eisenberg opined that such increase was attributable to Ace's recognition of major problems experienced by B.S.I. Specifically, the increase addressed, in part, the $1,800,000.00 loss projected as a result of Ace purchasing B.S.I.'s paper, in addition to other projected losses. (Tr. 50; Exhibit H, p. 8).

His valuations of Ace's assets and liabilities are set forth in the "Fair Value" columns beginning on page 5 of Exhibit "H," with reference notes appended. In several instances it is noted that he adopted Ace's book values as his fair values for both the assets and liabilities. In certain other instances there were substantial variances between the two (i.e., book value vs. fair value). For the period ending June 30, 1982, Mr. Eisenberg applied a fair value of $5,204,259.00 to Ace's assets and $8,163,-885.00 as a fair valuation of Ace's liabilities and equities. He expressed an opinion of certainty respecting these valuations, indicating that Ace was insolvent during such time period.

For the period ending December 31, 1982, Mr. Eisenberg valued the assets and liabilities of Ace, reflecting total assets of $5,426,635.00, against liabilities of $8,964,-380.00. Once again, the valuation revealed that Ace was in an insolvent posture for the subject period. For the period ending

December 31, 1983, the valuation applied to Ace's liabilities and assets revealed assets fair valued at $3,904,626.00, against liabilities of $9,600,706.00. Again, such valuation indicated that Ace was in an insolvent posture for the subject period. In each of the three above-mentioned periods, Mr. Eisenberg expressed an opinion that he applied a fair valuation to Ace's assets and liabilities, using the source data provided by his retained accountant, Steve Friedman. Moreover, upon inquiry, Mr. Eisenberg testified unequivocally that upon thirty-six different dates ranging between November 5, 1982 through August 10, 1983, the sum of Ace's debts exceeded the fair valuation of its assets, and that no material beneficial change in Ace's financial condition occurred between June 30, 1982 to December 31, 1983.

The Plaintiff's valuation of Ace's finance receivables was also addressed. Therein, with the exception of B.S.I., Euclid Truck, and the Floor Plan—Euclid Truck, Eisenberg adopted as fair values the book values established by Ace. (See, Exhibit H, p. 6). Reference notes numbered 1, 2, and 3 explained the variances in valuation relating to B.S.I., Euclid Truck, and the Floor Plan—Euclid Truck. Briefly stated, B.S.I. was zero-valued for the reasons previously stated; Euclid Truck was zero-valued based upon the fact that they were loans which were in a default status at June 30, 1982, December 31, 1982 and December 31, 1983. Similarly, this accounted for the zero valuation of the Floor Plan—Euclid Truck (Exhibit H, p. 6).

In correlating the various exhibit findings and trial testimony to the applicable statutory scheme, it becomes readily apparent that Ace was insolvent at all pertinent times within the preferential period. Ace's petition was filed on October 20, 1983, with the 90–day preferential period commencing on July 23, 1983. Subsequent to its petition filing, Ace twice amended its Schedule A–3 to reflect increased liabilities. The effect of these amendments caused Ace to become insolvent at the time it filed its petition in bankruptcy. Ace intended for

the additional liabilities set forth in its two amendments to have been included in its original schedules. This intent was clearly evidenced by Ace's initial "Amendment to Schedule A–3," (Defendant's Exhibit # 2), which stated in relevant part, "Now comes the debtor and states that because of [its] inadvertence or error [it] failed to include in [its] schedule A–3...." In the second amendment to schedule A–3, (Defendant's Exhibit # 3), in relevant part, Ace likewise stated that the omission of the amended indebtedness from its original schedule was due to "inadvertence or error." Whichever the basis for the omission, the net result was an insolvent debtor at the time of the petition filing.

■ In the absence of bad faith or detrimental reliance, Bankruptcy Rule 1009 liberally allows schedules to be amended by the debtor at any time before the case is closed. *In Re Lagniappe Inn of Nashville,* 50 B.R. 47, 50 (Bankr.M.D.Tenn. 1985). Thusly, there was nothing improper about the amendments. The amendments simply and more accurately portrayed the true financial posture of Ace as being an insolvent debtor at the time it filed its bankruptcy petition. Unliquidated and/or contingent debts may be added to schedules by amendment on a liberal basis; and, as a result, the amendment relates back to the date the schedules were originally filed with the Bankruptcy Court. Thusly, the additional debts are to be considered along with the other scheduled debts for the purpose of determining solvency. In so doing, the amended debts rendered Ace as being insolvent at the time of its petition. This is so notwithstanding the testimony of Ace's former President, Harry Apisdorf which stated that Ace was solvent at the time of petition filing. Such testimony is not well-founded and especially pales when viewed against the overwhelming evidence to the contrary. *See, In Re Foreman Industries,* 59 B.R. 145 (S.D.Ohio 1986); *In Re Tuggle Pontiac, etc.,* 31 B.R. 49 (Bankr.E.D.Tenn. 1983). It is well established that "values assigned by a debtor to assets for balance sheet or other purposes are not determinative of their fair valuation." *In Re Bellan-*

*ca Aircraft, Corp.,* 56 B.R. 339, 13 B.C.D. 1172, 1200 (Bankr.D.Minn.1985).

Beyond this point, there remains to be determined whether Ace was insolvent at the time of the alleged preferential transfers. For that purpose, our attention is drawn to the testimony of the Plaintiff's expert, Earl Eisenberg, and the substance of the exhibits which were admitted into evidence.

Unequivocally, Mr. Eisenberg opined that the debtor, Ace, was insolvent during the financial statement periods which ended with June 30, 1982, on December 31, 1982, and on December 31, 1983, based upon his valuation of Ace's assets and liabilities. Moreover, on thirty-six specific dates which were within the parameters of the subject preferential period, Mr. Eisenberg stated that, based upon his valuation of Ace's assets and liabilities, Ace was in an insolvent posture during each of the referenced dates. In the face of such testimony, the Defendants presented no testimony or other evidence to refute the testimony of Eisenberg's valuation methodology and/or conclusions. In fact, upon the close of Plaintiff's case-in-chief, the Defendants rested after proffering four exhibits for admission into evidence. Not a single witness was called to refute the testimony of Mr. Eisenberg.

■ The burden of persuasion was wholly upon the Plaintiff, Creditor's Committee, to prove insolvency by clear and convincing evidence. This burden was met. The testimony of Mr. Eisenberg was of substantial assistance to the Court, despite the fact that no contradictory testimony was presented. The fact that he targeted certain assets and liabilities for valuation, while adopting the book values on others, was yet impactful and overwhelmingly evident of the fact that much of Ace's assets were not previously fair-valued. In this regard, specific reference is made to the valuation of the finance receivables of Ace's B.S.I. subsidiary, Ace's investment in B.S.I., the lapsed option of Ace's real estate development purchase option, the Euclid

Truck loan default, and other net operating losses heretofore mentioned.

The basis of Eisenberg's valuation was both substantial and meritorious. The re-stated financial data provided to him by his retained accountant, Steve Friedman, was sufficiently adequate documentation upon which to base his valuations. Although the Defendants made numerous attempts through rigorous cross-examination to dis-credit the source data on which Eisenberg developed his conclusions, not a shred of evidence was produced by them in contra-diction.

The totality of: the zero-valuation of Euclid Truck in view of its attendant loan defaults; the zero-valuation of B.S.I., based upon its substantial losses hereto-fore mentioned, coupled with a 32% collec-tion delinquency rate; and the undue infla-tion of B.S.I.'s assets by Ace on December 31, 1982, as being $2,361,000.00 on its fi-nancial statement when $1,865,042.00 of that amount constituted good will ("pur-chase price in excess of tangible assets acquired"), leaving actual tangible assets in an amount of $495,966.00, which faced total liabilities of $2,465,988.00, is clearly evident of an insolvent Ace at all relevant times regarding the subject transfers. Further, this Court has not received sufficient com-petent evidence to rebut the presumption that the insolvent condition of Ace did not persist during the entirety of the subject financial periods. *See, Denaburg v. Post Welding Supply Co.*, 7 B.R. 274 (Bankr.N. D.Ala.1980).

The concept of value is not an easily defined one, since it is not a "natural or fixed quality," but rather, one that varies. *Collier*, on Bankruptcy 15th ed. ¶ 101–26 at 101–54 (1985). For purposes of assessing valuation, the Court is controlled by the statutory standard provided in 11 U.S.C. 101(29) (formerly 101(26)), for its determi-nation of fair valuation. Eisenberg very adroitly valued Ace's assets on a going concern basis. To assist him with his valu-ation efforts, he had the benefit of Arthur Anderson & Company's audit notes which were reviewed by him, in addition to vari-ous working papers and trial balances pre-pared by Arthur Anderson which further bolstered the extracted source data pre-pared by the accountant Friedman. Taken as a whole, the opinion testimony of Earl Eisenberg, and the Plaintiff's Exhibits H and J, clearly demonstrate that Ace was insolvent at all relevant times within the preference period and, further, there was no material beneficial change in Ace's fi-nancial status during the pertinent time periods.

## CONCLUSION

WHEREFORE, based upon the above-stated findings, the Debtor, Ace Finance Company, was insolvent at the time of its petition filing in this Chapter 11 proceed-ing, and at all relevant times within the subject preference period.

IT IS SO ORDERED.