**In re CARLEY CAPITAL GROUP, Debtor.**

**Bankruptcy No. MM11-89-00587.**

United States Bankruptcy Court, W.D. Wisconsin.

June 13, 1991.

See also 128 B.R. 652.

Paul A. Lucey, Godfrey & Kahn, Milwaukee, Wis., for debtor.

Clara L. Slifkin, Deputy Atty. Gen., Los Angeles, Cal., for State of Cal.

Susan V. Kelley, Murphy & Desmond, S.C., Madison, Wis., for Gleischman Sumner Co.

Sheree Gowey, Asst. U.S. Trustee, Madison, Wis.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

Gleischman Sumner Company ("GSC"), appointed to liquidate the debtor under Chapter 11 plans confirmed in the cases of Carley Capital Group ("CCG"), James E. Carley, and David Carley (collectively referred to hereafter as the "Debtors"), objects to the priority use tax claim of the

State Board of Equalization of the State of California (the "Board"). The objection is directed to the Debtors' amendments to Schedule A-1 on June 14, 1990 adding the Board's tax claim of $47,152.39 to the schedule of priority creditors.

The Board's claim arises from use tax on personal property purchased to renovate and equip CCG's Mission Inn project in Riverside, California. CCG's Los Angeles office apparently had prepared and filed use tax returns for the Mission Inn project through the third quarter of 1988. In December, 1988, Debtors' interests in the Mission Inn project were conveyed to Chemical Bank, a major creditor of the project. Subsequently, CCG's Los Angeles office was closed.

Debtors' Chapter 11 bankruptcy cases were commenced on March 10, 1989. The Debtors filed their lists and schedules on May 22, 1989. The original Schedule A-1 did not include the use tax claim of the Board.

On May 31, 1989, CCG's then-chief financial officer, Daniel McCarty, wrote a letter to the Board, apparently in response to use tax notices from the Board, advising it of the pendency of Debtors' bankruptcy cases. Because of the December, 1988 conveyance of the Mission Inn project to Chemical Bank, mail and other correspondence related to Mission Inn apparently was routinely forwarded to Chemical Bank by the Debtors.

On June 27, 1989, the court entered an order fixing September 5, 1989 as the Claims Bar Date in the Debtors' cases.

According to correspondence of Debtors' counsel, a final use tax return for the Mission Inn project for the fourth quarter of 1988 was submitted to the Board on March 8, 1990. Subsequently, the Board notified the Debtors in late April, 1990 of underpayment of use taxes for the third quarter of 1988. Following investigation and recalculation by Debtors' counsel of the Board's use tax claims for the third and fourth quarters of 1988, Debtors filed an amended fourth quarter 1988 use tax return with the Board. In addition, Debtors filed amendments to Schedule A-1, Creditors Having Priority, on June 14, 1990, which added the Board's use tax claim of $47,152.39. The Board's claim was not scheduled as disputed, contingent, or unliquidated. The June 14, 1990 additions, deletions, and amendments resulted in a $130,912.96 net increase to the Debtor's priority liabilities, raising total priority claims to $307,773.02. $126,618.51 of this net increase was attributable to the added claim of the Cook County Treasurer for 1988-90 real estate taxes in Evanston, Illinois, which is not at issue in this matter. Notices of the amendments were sent out to creditors and other interested parties on June 18 and 22, 1990.

Despite Debtors' amendment to Schedule A-1 adding the Board's claim, on July 3, 1990 the Board filed its proof of priority claim of $47,466.85 for third and fourth quarter 1988 use taxes. The Board's proof of claim was filed approximately nine months after the Claims Bar Date without any corresponding request for an extension of time.

On August 1, 1990, Debtors' and Creditors' Committee's Second Amended Chapter 11 Plan, as Modified (the "Plan") was confirmed by the court. GSC filed its objection to the Board's claim on November 7, 1990. At the January 22, 1991 hearing on the objection to claim, Debtors, by counsel, orally amended Schedule A-1 to delete certain claims which had been added by Debtors' prior amendments. Thus, the sole dispute between the parties is the allowance of the Board's use tax claim.

## I.

 The first issue is whether GSC is authorized to object to the disputed claim. GSC's authority is granted by § 5.2(x) of the plan which provides:

> Notwithstanding anything in this Plan to the contrary, the Designated Person [G.S.C.] and the Creditors' Committee shall not [take] and shall not have any authority to take any action which will create or result in any liability or Claim (except an Avoidance Claim) against Carley Capital Group, James E. Carley and David Carley.

Second Amended Plan at 38. Section 5.2(x) purportedly limits the actions of GSC to those which will not "create or result in any liability or Claim (except an Avoidance Claim) against" Debtors. There is no reported analysis of the enforceability of such a plan term.

Debtors' counsel contends that GSC is without authority under § 5.2(x) to make its objection to the Board's use tax claim because the Board's claim falls, in all likelihood, within the § 523(a)(1) exception to discharge, thereby resulting in post-bankruptcy liability for Debtors and undermining their fresh start. GSC was designated by this court to carry out an orderly and efficient post-confirmation liquidation of Debtors' assets for distribution to creditors. In order to facilitate this objective, the Plan set forth specific powers which GSC could exercise and corresponding limitations on those powers. Article V of the Plan gave broad, but not limitless, powers to the person designated in an effort to protect the continuing interests of unsecured creditors, as well as those of Debtors, during the pendency of Debtors' Chapter 11 cases. A literal interpretation of the language in § 5.2(x) certainly suggests that, because sustaining GSC's objection to the Board's claim will "create or result in" liability against Debtors, GSC is without authority to object to the Board's claim under § 5.2(x). Literal construction of § 5.2(x) serves to effectuate the "fresh start" policy of the bankruptcy laws.

Counsel for GSC argues that strictly interpreting § 5.2(x) as imposing such a limitation on its authority to object undercuts the goal of maximizing distributions to Debtors' unsecured creditors and creates a material inconsistency in the Plan. If GSC is precluded from reducing the number of claims against Debtors' estate as a result of § 5.2(x), GSC's ability to maximize distributions to Debtors' unsecured creditors might be significantly circumscribed. This concern is overstated. The limitations on GSC's authority to object only pertains to actions taken that create or result in liability against Debtors. The reach of these limitations is confined. The contention that

the Plan is materially inconsistent is not well supported.

■ GSC's alternative argument is that a February 14, 1990 letter agreement between the Creditors' Committee and Debtors explicitly reserved GSC's right to object "to any tax or other claim" without regard to § 5.2(x) of the Plan. However, the letter agreement merely provided that Debtors and the Committee agreed to file a joint plan, giving Debtors specific rights to withdraw their proposal of the first plan filed upon discovery and identification of material tax claims while reserving the Committee's rights to challenge the allowance of particular claims. The intent of the agreement appears to have been to provide a written understanding of the parties regarding the means for the Committee to assert its interests up until the time when the Plan was confirmed. Following confirmation, the post-confirmation designated person would function in a capacity similar to that of the pre-confirmation Committee. However, by the Plan provisions as agreed to by the Committee and Debtors, the designated person's role in Debtors' post-confirmation cases was specifically delineated under Article V. Therefore, the letter agreement should be distinguished from the Plan in terms of its applicability. The terms of the confirmed Plan provide the sole guidance for GSC's post-confirmation role. GSC is prohibited by the plan from objecting to the subject tax claim.

## II.

Even if GSC were not precluded by the plan from objecting to the claim, the objection would not prevail. The following discussion is provided solely to demonstrate that the outcome would be the same under either analysis.

Counsel for GSC argues that the Board's claim should be barred because it was filed after the Claims Bar Date had expired. No extension of time for late filing nor any explanation for the absence of prior filing was made. Ironically, GSC's counsel also contends that Rule 3003(c)(4) should be applied to the Board's claim so that Debtors'

amendment to Schedule A–1 would be superseded by the Board's late-filed claim.

■ Rule 3003(c)(4) does not govern this situation. It provides that a proof of claim "executed and filed *in accordance with this subdivision* [i.e. Rule 3003(c) ] shall supersede any scheduling of that claim" by the debtors under § 521(1) of the Code (emphasis added). The Board's claim was not filed before the Claims Bar Date as required in Rule 3003(c)(3), so its claim was not filed in such a way as to bring it within subdivision (c)(4).

The factual setting is better analyzed under the Code and Rules cited in the Debtors' and the Board's arguments. Rule 1009 permits schedule amendments "by the debtor as a matter of course at any time before the case is closed." The Advisory Committee Note indicates that Rule 1009 "continues the permissive approach adopted by former Bankruptcy Rule 110 to amendments of voluntary petitions and accompanying papers." In addition, "[a]llowing amendments at any time before the case is closed serves the Bankruptcy Code policy of maximizing a debtor's 'fresh start.'" *In re Davis*, 38 B.R. 585, 587 (Bankr.M.D.Tenn.1984). Rule 3003(c)(2) requires a creditor to file proof of claim before the claims bar date if "not scheduled or scheduled as disputed, contingent, or unliquidated...." And § 1111(a) provides that a claim is deemed filed if it appears in the debtor's schedules, except if the claim is scheduled as disputed, contingent, or unliquidated.

In *In re Heritage Village Church & Missionary Fellowship, Inc.*, 87 B.R. 17 (Bankr.S.C.1988), the court had to decide whether an actual proof of claim was required to be filed when claims were assigned after the claims bar date had passed. The court initially discussed the general rule of § 1111(a) providing that " 'a proof of claim or interest is *deemed* filed ... that appears in the [debtor's] schedules ... except a claim or interest that is scheduled as disputed, contingent, or unliquidated.' " *Id.* at 18 (emphasis in original). The court then went on to discuss Rule 3003:

Bankruptcy Rule 3003 governs the procedure for filing proofs of claims in the Chapter 11 case. A debtor's schedule of liabilities constitutes *prima facie* evidence of the validity and the amount of a creditor's claim. It is not necessary for a creditor or an equity security holder to file a claim *unless* the claim is not scheduled or is scheduled as disputed, contingent or unliquidated. It is the creditor's responsibility to determine if its claim is listed in the correct amount. If the creditor disputes the amount listed, it must file a claim within the time period fixed by the Bankruptcy Court.

Id. (emphasis in original).

■ The facts of this case fall within the scope of Rules 1009 and 3003(c) and § 1111(a) of the Code. Debtors' amendments were made to their Schedule A–1 before their bankruptcy cases were closed. In addition, Debtors gave notice of their amendments to all interested parties as required by Rule 1009. The Board's use tax claim was properly scheduled so as not to require a separate proof of claim under Rule 3003(c)(2). The Board's subsequent proof of claim was not filed before the Claims Bar Date as required to apply Rule 3003(c)(4) treatment. As a result of Debtors' amendments, the Board should have an allowable claim under § 502 in the amount scheduled by Debtors.

Although the Code and Rules generally support Debtors' and the Board's positions, all litigants in this objection to claim action agree that the application of Rule 1009 is not unqualified. Courts may refuse to allow amendments where the debtor has acted in bad faith, where creditors have detrimentally relied on the original documents, or where property has been concealed. See, e.g., *Lucius v. McLemore*, 741 F.2d 125 (6th Cir.1984) (debtors permitted to add assets to exemption schedule in spite of objections of trustee because debtors had no impermissible intent); *Matter of Brown*, 56 B.R. 954 (Bankr.E.D.Mich.1986) (debtor permitted to add debt to schedule 18 months after discharge, but allows creditor additional time to file complaint alleging exception to discharge); *In re Ace Finance*

*Co.,* 64 B.R. 688 (Bankr.N.D.Ohio 1986) (court permits debtor to amend scheduled liabilities twice to more accurately portray debtor's financial posture).

Because a debtor's fresh start may be substantially jeopardized by disallowing requested amendments, courts have developed varying approaches to justify liberal allowance of amendments. For example, in *Matter of Brown,* 56 B.R. at 958, the court held that "under Rule 1009 when an amendment is sought in an open case and prejudice is alleged, that if the prejudice to the Debtor outweighs that to the Creditor Defendant then an amendment should be allowed." And in *In re Davis,* 38 B.R. at 587–88, the court stated:

> [T]he failure to claim the exemption in the original documents is almost always the result of 'attorney oversight' or 'miscommunication' between the attorney and client not intentional misconduct or gross neglect.... The trustee and affected creditors can be protected from prejudice and fraud by requiring reimbursement of costs and expenses reasonably incurred in detrimental reliance on the original exemption schedule on a case-by-case basis.

■ This court has utilized a four-part analysis in determining the permissibility of amendments made by debtors. *In re Snow,* Adv.Pro. No. 80–0150 (Bankr. W.D.Wis. Dec. 31, 1981); *Matter of Bessel,* 18 B.R. 320 (Bankr.W.D.Wis.1982). Although the test was established under former Bankruptcy Rule 110, the predecessor of current Rule 1009, the Advisory Committee Note to Rule 1009 reaffirms the legislative intent of the "permissive approach adopted by" Rule 110, thereby preserving the validity of the four-part analysis. The important issues to be examined, as set forth in *Matter of Bessel,* 18 B.R. at 322–23, are as follows:

a. Whether an adverse party's rights will be prejudiced if an amendment is allowed. This question is important both because the equitable issue of fairness is involved, and because evidence of cynical motives in not originally claiming the dis-puted property as exempt might be revealed.

b. Whether not allowing the amendment will cause undue hardship to a debtor who has acted in good faith. This must be considered because not allowing an exemption could thwart a deserved fresh start.

c. Whether there is a reasonable excuse for not claiming the exemption on the original schedule.

d. Whether there is a reasonable excuse for any delay in seeking the amendment.

In both *Snow* and *Bessel,* the first two elements were determinative in the decision to allow debtors' amendments, consistent with the court's observation that "[t]he first two considerations should carry the most weight." Id. at 323. No significant reliance by the trustee was found in either case to warrant disallowing the debtors from amending their exemption schedules. Moreover, not allowing the amendments would have resulted in hardship to the debtors because property otherwise available as exempt would be claimed by the trustees in each case, thereby substantially impairing the debtors' fresh starts. Although the debtors advanced no excuses for their failure to properly claim exemptions or for their delay in seeking the amendments, the court concluded in *Bessel,* as it had in *Snow,* that "the first two elements of the test indicate a result favorable to the debtor, and that result should not be lightly overturned." Id.

■ Applying the four-part analysis to the facts of this case, there appears to be little if any justification for refusing to allow Debtors' amendments under Rule 1009. First, the rights of unsecured creditors have not been significantly and prejudicially affected. The Creditors' Committee was aware of Debtors' intent to amend their schedules after the Claims Bar Date, eliminating the possibility of significant reliance on the amount of any distribution expected from Debtors' estates. According to GSC, distributions are not expected to exceed ten percent for unsecured claim amounts. Excluding the addition of the

Cook County Treasurer's claim, the net effect of the June 14, 1990 additions, deletions, and other amendments resulted in only a relatively insignificant increase of $4,294.45 to the total of Debtors' priority claims. However, this net priority claims increase was substantially eliminated by Debtors' January 22, 1991 oral amendments. When divided among all unsecured creditors, the actual impact of Debtor's amendments on individual unsecured creditor's distributions was not prejudicial.

Second, not allowing the amendment may well result in a substantial hardship to Debtors due to the probable application of § 523(a)(1) exceptions to discharge to the Board's use tax claim. Debtors' fresh starts might thereby be thwarted, subverting one of the central policies of the Bankruptcy Code. The prejudice which would be sustained by Debtors individually if the Board's claim is disallowed certainly would outweigh any prejudice sustained by each unsecured creditor individually if the Board's claim is allowed.

Finally, although the Board has not asserted any excuses for not filing a proof of claim before the Claims Bar Date, GSC has not alleged that either the Board or Debtors have acted in bad faith. No facts which would support such a claim have been revealed. The only facts known to the court support the allowance of the amendments as reasonable under the circumstances.

Debtors were involved in multiple business ventures and operated out of numerous offices across the United States. Personnel reductions and satellite office closings, before and after bankruptcy were undertaken to save expenses, creating administrative difficulties for Debtors. The limited personnel available to Debtors could certainly be expected to cause delays in processing information pertinent to their bankruptcy cases. The fourth quarter 1988 use tax return for the Mission Inn project appears to have suffered from Debtors' employment cutbacks. Because the Board had insufficient information from which to work, it could not readily assess its use tax claim until the return was first filed in March, 1990.

In sum, "the first two elements of the test indicate a result favorable to the debtor, and that result should not be lightly overturned." *Matter of Bessel*, 18 B.R. at 323. Rejection of Debtors' amendments and disallowance of the Board's claim is not warranted by the facts and circumstances of Debtors' cases.

The court having this day entered its memorandum decision in the above-styled matter,

IT IS HEREBY ORDERED that Gleischman Sumner Company's objection to the claim of the State Board of Equalization of the State of California is denied.